UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GENERAL MOTORS CORP.,

       Plaintiff(s),

v.

KEYSTONE AUTOMOTIVE INDUS., INC.
and TONG YANG INDUS. CO., LTD.,

       Defendant(s).

_____/

Case No. 02-74587

Honorable Nancy G. Edmunds

## ORDER GRANTING DEFENDANTS' MOTION [223] AND DENYING PLAINTIFF'S MOTION [227] FOR SUMMARY JUDGMENT ON LIKELIHOOD OF CONFUSION AND DENYING DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S BRIEF [248]

This is a trademark dispute. All parties have filed motions seeking summary judgment on the issue of likelihood of confusion. Because the Court finds that there is not a likelihood of confusion between Plaintiff's and Defendants' products and for the reasons stated below, the Court GRANTS Defendants' motion and DENIES Plaintiff's motion. In addition, the Court DENIES Defendant's motion to strike portions of Plaintiff's brief.

## I.    Factual and Procedural Background

This case began on November 11, 2002, when Plaintiff General Motors Corporation ("GM") filed a complaint against Defendants Keystone Automotive Industries ("Keystone") and Tong Yang Industry Company ("Tong Yang"). GM manufactures and sells automobiles and replacement parts. (Compl. ¶ 10.) Tong Yang also produces and sells automobile replacement parts for vehicles such as those manufactured by GM. (Id. ¶ 27.) Tong Yang makes the parts in Taiwan and sells them to distributors such as Keystone for sale in the

United States.  (Id. ¶¶ 27-28, 30-31.)  Keystone sells most of the parts to collision repair shops (including some owned by GM), but also sells to individual vehicle owners over the Internet.  (Hogarty Decl. ¶ 7.)

The complaint alleged that specific Tong Yang replacement grilles used GM designations and therefore violated (1) GM's federal and Michigan common law trademark rights, (2) § 43(a) of the Lanham Act, and (3) Michigan common law regarding unfair competition.  (Compl. ¶¶ 41-55).[1]  The trademarks at issue are the Chevrolet "bow tie" and "GMC" designs.  (Id. ¶ 32.)[2]  The Tong Yang parts implicated by the complaint are replacement grilles which have indentations of these GM trademarks.  (Id. ¶ 32-33.)  A colored, plastic emblem (manufactured and sold by GM) is then placed on the indentation.  (Cornell Decl. ¶¶ 3, 4.)

Defendants answered the complaint denying liability and setting forth a number of affirmative defenses:

(1) implied license,
(2) functionality,
(3) laches,
(4) acquiescence,
(5) equitable estoppel,
(6) waiver,
(7) ratification, and
(8) unclean hands.

---

[1]GM amended the complaint on April 15, 2003 and then again on February 20, 2004. In its second amended complaint, GM added a Lanham Act false advertising claim against Tong Yang.  (Second Am. Compl. ¶ 43.)

[2]These Chevrolet and GMC trademarks were registered as U.S. Reg. No. 95,398 ("the '398 registration") and U.S. Reg. No. 1,569,557 ("the '557 registration") respectively. (Second Am. Compl. ¶¶ 12, 18.)

2

(Keystone's Answer and Affirmative Defenses to Second Am. Compl. at 7-9; Tong Yang's Answer and Affirmative Defenses to Second Am. Compl. at 7.)[3]

On December 23, 2003, GM filed a motion to dismiss the implied license defense and a motion for summary judgment on the functionality defense. The Court granted GM's motion on the implied license issue but denied the motion regarding functionality. (April 8, 2004 Order.) Then, on May 5, 2004, GM filed a motion for summary judgment regarding the affirmative defenses of laches, acquiescence, and equitable estoppel. The Court granted this motion with regard to the latter two defenses, but found a genuine issue of material fact concerning laches. (December 1, 2004 Order.)[4] The parties have filed cross motions for summary judgment regarding the likelihood of confusion–i.e., the dispositive issue in GM's claims.

## II.   Standard of Review

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an

---

[3]Tong Yang did not raise an equitable estoppel or implied license defense. (Tong Yang's Answer and Affirmative Defenses to Second Am. Compl. at 7.)

[4]In this order, the Court also granted Tong Yang's motion to dismiss the false advertising claim. (December 1, 2004 Order.)

element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.  Likelihood of Confusion

Before diving into the legal tests, it is necessary to establish the background and policy behind this area of the law. "Under the modern definition of the term 'trademark,' both the common law and federal law follow the definition set forth in the federal Lanham Act: a trademark is a designation used 'to identify and distinguish' the goods of a person." 1 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 3:1 (4th ed. 1996)(quoting and citing 15 U.S.C. § 1127)(footnote omitted) [hereinafter "MCCARTHY ON TRADEMARKS"]. As with the "bow tie" and "GMC" designs, some trademarks are registered with the United States Patent and Trademark Office. These registered trademarks are protected by Section 32 of the Lanham Act, 15 U.S.C. § 1114.

4

Unregistered trademarks are also protected however.  *See* 15 U.S.C. § 1125(a); *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).  Regardless of its registration status, the polices underlying the protection are the same: "consumer protection, property rights, economic efficiency and universal concepts of justice . . . ."  1 MCCARTHY ON TRADEMARKS § 2:2.  It is also important to note, however, that "[i]n a given case, these policies are sometimes conflicting and must be weighed and sifted by the court[.]"  *Id.*

In most infringement cases, there will be two competitors that designate their products (or services) with similar names and/or symbols.  For instance, if a new automobile manufacturer produces a car and, to identify the origin, uses a horizontally-stretched cross (e.g., ⊟), GM may bring an action alleging that users will confuse this new car for a Chevrolet because its designation resembles the "bow-tie" mark.

This case is somewhat different.  Plaintiff and Defendants are competitors in the field of replacement parts.  GM is not, however, arguing that the Tong Yang parts use similar marks to identify origin; rather, it claims that the parts are illegally using *its trademark*–without alteration.  Defendants do not seriously contest that some of the parts are embedded with the exact "bow tie" or "GMC" symbol.  Instead, they argue, initially, that no purchaser would view the symbol on the replacement parts as an indicator of origin.[5] This argument is derived from the purpose of the goods: they are replacement parts for GM vehicles.  According to Defendants, this implies two things.  First, the use of the symbol is necessary (or at least legal) so the larger end product can be identified.  Second, no user

---

[5]As noted above, Defendants also argue that several affirmative defenses apply–e.g., even if the symbol does indicate origin, there can be no violation because it is "functional." Some of these affirmative defenses have been addressed in the Court's previous orders.

5

is likely to confuse the indentation or placeholder as an indicator of origin.  *See* 1 McCarthy on Trademarks § 3:3 ("To be held liable, an alleged infringer must have used the plaintiff's trademarked word, slogan or design as a trademark.  That is, if defendant's use is in a purely non-trademark sense, then probably no one is likely to be confused.").

It is also important to note what GM is not alleging in this action–trade dress infringement.  Trade dress protection was historically for product packaging, but has been expanded to include a product's shape.  *See*, *e.g.*, *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 80 n.2 (3d Cir. 1982)("Although historically trade dress infringement consisted of copying a product's packaging, . . . 'trade dress' in its more modern sense [refers] to the appearance of the [product] as well as its packaging . . . .")(citation omitted).  GM is not, however, making this type of claim–e.g., that the shape and appearance of the Tong Yang grille constituted a trade dress violation.  (*See* Pl.'s Br. in Supp. of its Rule 54(b) Mot. at 2 ("This case involves infringement of incontestable, federally-registered trademarks; no trade dress claim is presented.")).

Plaintiff's trademark claims were brought pursuant to Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1125, and Michigan common law.  However,

> the same result is reached whether the legal wrong is called trademark infringement or unfair competition.  In such cases the courts often lump them together and speak of them as identical concepts.  Today, the keystone of that portion of unfair competition law which relates to trademarks is the avoidance of a likelihood of confusion in the minds of the buying public.  Whatever route one travels, whether by trademark infringement or unfair competition, the signs give direction to the same enquiry—whether defendant's acts are likely to cause confusion.

1 McCarthy on Trademarks § 2:8 (footnotes and citations omitted); *see also* 15 U.S.C. § 1114(1) (a violation occurs if the "use is likely to cause confusion, or to cause mistake,

6

or to deceive"); 15 U.S.C. § 1125(a) (same); *Carson v. Here's Johnny Portable Toilets, Inc.*,

698 F.2d 831, 833 (6th Cir. 1983)(Michigan common law unfair competition claim uses

likelihood of confusion test); *Boron Oil Co v. Callanan*, 213 NW2d 836, 838 (Mich. Ct. App.

1973)(Michigan common law trademark infringement claim uses same test).

This is a complex case and presents different avenues for potential confusion and,

thus, liability.  First, it is possible that the initial buyer of Defendants' good will be confused

about its origin.  This is referred to here as "point of sale confusion" and will be addressed

in section III(A).  Next, subsequent purchasers and/or the viewing public may be confused.

This "downstream confusion" is addressed in the following section, III(B).  Similarly, a

person may be confused when a third-party passes off Defendants' product as GM's.  In

some of these situations, the producer may be liable for "contributory infringement."  This

is discussed in section III(C).

The Sixth Circuit has set out eight factors for courts to consider when evaluating the

likelihood of confusion.  These factors will be the underpinnings of the analysis:

> 1. strength of the plaintiff's mark;
> 2. relatedness of the [goods];
> 3. similarity of the marks;
> 4. evidence of actual confusion;
> 5. marketing channels used;
> 6. likely degree of purchaser care and sophistication;
> 7. intent of the defendant in selecting the mark; and
> 8. likelihood of expansion of the product lines using the marks.

*Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 763 (6th Cir. 2005)(citing *Frisch's Rests., Inc.*

*v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982), *cert. denied*, 459

U.S. 916 (1982)).  However,

> [t]hese factors imply no mathematical precision, but are simply a guide to
> help determine whether confusion is likely.  They are also interrelated in

7

> effect.  Each case presents its own complex set of circumstances and not all
> of these factors may be particularly helpful in any given case. But a thorough
> and analytical treatment must nevertheless be attempted.   The ultimate
> question remains whether relevant consumers are likely to believe that the
> products or services offered by the parties are affiliated in some way.

*Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir.

1991)(footnote omitted).

This "likelihood of confusion" determination creates questions of fact and law.

*PACCAR Inc. v. TeleScan Technologies, L.L.C.*, 319 F.3d 243, 250 (6th Cir. 2003).  First,

for this summary judgment motion, the Court must address whether there is any genuine

issues regarding the material, foundational facts.  *Id.*  If none exist, the Court must decide

the legal question: is Defendants' use of the marks is likely to cause confusion?  *Id.*

### A.  Point of Sale Confusion

The Court begins, as it must, by addressing the eight factors listed above.

*1. Strength of the Plaintiff's Mark*

> The strength of a mark is a factual determination of the mark's
> distinctiveness.  The more distinct a mark, the more likely is the confusion
> resulting from its infringement, and, therefore, the more protection it is due.
> . . . A mark is strong if it is highly distinctive, i.e., if the public readily accepts
> it as the hallmark of a particular source; it can become so because it is
> unique, because it has been the subject of wide and intensive advertisement,
> or because of a combination of both.

*Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985)(quotation and

citation omitted).

In this case, the scope of GM's registration has been the subject of intense debate.

However, it is not necessary to resolve this issue here.[6]  Regardless of the registration, it

_____

[6]Even if, as Defendants contend, the '398 and the '557 registration do not include
replacement parts, Plaintiff has brought a Section 43(a) claim which protects unregistered

8

can hardly be debated that the public, when it views the "bow tie" and "GMC" marks, associates the product with GM.[7]

### 2. Relatedness of the Goods

Courts have recognized that there are basically three categories of cases: (1) direct competition of [goods], in which case confusion is likely if the marks are sufficiently similar; (2) [goods] are somewhat related but not competitive, so that likelihood of confusion may or may not result depending on other factors; and (3) [goods] are totally unrelated, in which case confusion is unlikely. These categories are helpful in gauging how important relatedness may be in the ultimate likelihood of confusion determination.

*Homeowners Group*, 931 F.2d at 1108 (citation omitted). The parties both produce replacement grilles for the same GM vehicles. As Defendants point out, however, the parties generally sell their goods to different buyers.[8] Thus, although the goods serve the same purpose, they are not directly competitive. *See id.* at 1109 ("[Goods] are 'related' not because they coexist in the same broad industry, but are 'related' if the [goods] are marketed and consumed such that buyers are likely to believe that the [goods], similarly marked, come from the same source, or are somehow connected with or sponsored by a common company.").[9]

_____

goods.

[7]Defendants contend that the mark is not strong because, in this context, users do not associate it with the origin of the product. This argument is discussed below as it addresses a different question. For the first factor, that GM marks in question are clearly well known and associated with its products ends the inquiry.

[8]This argument is discussed further in the "Marketing Channels" factor. *See* § III(A)(5) *infra.*

[9]Keystone has brought a motion to strike portions of GM's brief because, it argues, GM did not disclose the facts it relies upon for its likelihood of confusion argument. It is not disputed that Keystone received this information through discovery. Thus, in this case, the Court does not believe that the Federal Rules of Civil Procedure or the Magistrate Judge's

### 3. Similarity of the Marks

Courts emphasize that this is normally an important factor. *See*, *e.g.*, *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 283 (6th Cir. 1997)("Similarity of marks is a factor of considerable weight.")(citation omitted). GM uses the "bow tie" and "GMC" marks. (Compl. ¶ 32.)[10] Tong Yang uses a "OTN" mark molded into its grilles. (Yang Decl. ¶ 8.) However, the parties do not debate the similarity of these marks. Instead, the arguments pertain to a different issue: would a relevant buyer (in this section, a point of sale buyer) view Defendants' use of the "bow tie" and "GMC" symbols as representing the origin of the parts? If there is an affirmative answer to this inquiry, the marks are not only similar, they are identical.

### 4. Actual Confusion

GM presents three scenarios that, it claims, evidence actual confusion. First, it cites to third-party articles which detail a practice known as "part swapping." According to GM, this occurs when an independent collision shop gives a repair estimate for a damaged vehicle including an OE part (such as a GM grille) but actually uses an independent aftermarket part (such as a Tong Yang grille). (Pl.'s Br. in Supp. of its Likelihood of Confusion Mot. at 6.) Assuming the latter type of grille is less expensive, the collision shop will make a profit by defrauding the customer in this manner.

---

order were violated and the motion is therefore denied.

[10]It is unclear whether, in order to distinguish the grille as an original equipment ("OE") part, GM puts either of these marks (or any other identification) on its replacement grilles in any place other than the area for the large medallion at issue in this case–e.g., whether they engrave anything on the back of the grille. The Court notes, however, that GM affixes the colored medallion to all its grilles before sale. (Morie Dep. at 36.)

The second practice mentioned by GM is called "cost shifting." It is a type of fraud similar to part swapping. This practice occurs when an independent collision shop creates a damage appraisal or final bill for repairs that has all or some of the cost of one item transferred to another. GM provides the following example:

> [An insurer may] simply give the insured vehicle owner a check in amount of the estimate less the deductible. If [the insurer] approves a repair estimate (including genuine, OE parts) in the amount of $2,500, and the deductible is $500, [the insurer] gives the insured a check in amount of $2,000, and has no further role in the repair or dealings with the collision shop. Collision shops . . . then approach the insured and offer to reduce or waive the deductible if the collision shop is allowed to buy the crash parts from another source. However, the vehicle owner is not told these alternative crash parts are not genuine, OE parts.

(Id. at 7-8.)

Third, GM claims the grilles lead to "mis-packaged returns"–e.g., a collision repair shop returning an independent aftermarket grille to GM in an OE grille's packaging. GM provides evidence of a specific instance where this was attempted, but thwarted by an employee in the return facility. However, the grille was not a Tong Yang part. (Pl.'s Counterstatement of Facts at 63.)

These alleged practices are not evidence of actual confusion at the point of sale. Actual confusion evidence requires a plaintiff to show that some of the defendant's actual customers purchased the product and believed it to be plaintiff's. GM has not done that here. Instead, it merely theorized possible methods for Defendants' customers to defraud subsequent purchasers. GM has not shown that any of the customers *were* confused, but rather that they *could be* confused. This is not evidence of actual confusion. Moreover,

11

GM has not shown that *Defendants' buyers* were confused[11] about the parts' origin–i.e., believes it to be a GM grille. This is not to say, as Defendants contend, that the Court's analysis can end here. The standard for proving infringement is *likelihood* of confusion, not *actual* confusion. *Daddy's Junky Music Stores*, 109 F.3d at 284. Nevertheless, GM has not provided evidence of actual confusion.

### 5. Marketing Channels

"This factor . . . consists of considerations of how and to whom the respective goods or services of the parties are sold." *Homeowners Group*, 931 F.2d at 1110. For example, "[i]f one mark user sells exclusively at retail and the other exclusively to commercial buyers, then there may be little likelihood of confusion since no one buyer ever buys both products." *Id.* (quoting MCCARTHY ON TRADEMARKS § 24:7 (2d ed. 1984)). Moreover, if one parties' goods "are sold through different marketing media in a different marketing context[,]" than there is less likely to be confusion. *Id.* Thus, there are two relevant inquires: First, are the plaintiff's customers also the defendant's customers? And second, if so, do the parties market the goods the same?

Tong Yang's customers are wholesale buyers and distributors such as Keystone. (Yang Decl. ¶ 4.) Keystone then sells the grilles to collision shops, including some GM dealerships. (Hogarty February 8th Decl. ¶ 7.)[12] GM, on the other hand, sells its grilles

---

[11]The event GM provides as evidence of mis-packaged returns also does not show "actual confusion" because the use was not confused about the origin: GM's employee recognized the difference in the grilles. Moreover, the part was not a Tong Yang grille.

[12]As GM points out, Keystone makes its parts available to the general public on its website, http://www.getcrashparts.com/. Keystone argues that GM must further present evidence that some customer actually purchased the parts on this website. This is not true; the standard governing the analysis is the *likelihood* of confusion. Nevertheless, for this

exclusively to GM dealerships. (Clark Dep. at 52-53.)[13] Thus, there is some overlap between GM's and Keystone's buyers–the GM dealerships. The Court is not made aware how many or what percentage of Keystone's business is done with these GM dealerships, however. Moreover, there is no evidence as to how the parties market their products.

### 6. Likely Degree of Purchaser Care

Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution. However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the [goods] at issue, a higher standard is proper. Similarly, when [goods] are expensive or unusual, the buyer can be expected to exercise greater care in her purchases. When [goods] are sold to such buyers, other things being equal, there is less likelihood of confusion.

*Homeowners Group*, 931 F.2d at 1111 (citations omitted).

GM cites *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277 (3d Cir. 1991) to support its argument that the Court should use a typical buyer standard, not one who has expertise in the field. Like this one, *Summit* was a case about replacement auto parts. Specifically, the plaintiff brought a trade dress claim against the defendants because they sold "transmission kits" and other "automobile parts" that were similarly packaged. *Id.* at 281. The Third Circuit, in addressing the degree of purchaser care, stated the general rule as follows: "when a buyer class is mixed, the standard of care to be exercised by the

---

factor, the Court is instructed to look to the parties' predominant customers. *See Daddy's Junky Music Stores*, 109 F.3d at 285 ("The fifth factor requires a court to consider the similarities or differences between the *predominant customers* of the parties' respective goods or services.")(emphasis added)(citation omitted). Keystone has presented evidence that its predominant customers are collision shops. (Hogarty February 8th Decl. ¶ 7.) GM has not contradicted this claim.

[13]As the Court noted in a previous order, GM is a part owner of some of these dealerships. (December 1, 2004 Order at 11-12.) At this time, the Court does not have evidence to show what percentage of GM dealerships are owned by GM.

reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class." *Id.* at 293.  The court then concluded, without discussion of the immediate and predominant purchasers of the defendant's goods, that the buying class at issue was mixed. *Id.* at 297-98.

GM claims that this case is similar to *Summit* because members of the public as well as others involved in the industry (e.g., collision repair shops) can purchase the replacement grilles.  As noted above, however, this Court must consider the predominant users of the parties' goods.[14]  In this case, this class consists of collision shop owners and others involved in the automobile industry.  These users have a higher degree of sophistication and, thus, there is less of a likelihood of confusion.

### 7. Intent of the Defendant in Selecting the Mark

"Intent is relevant because purposeful copying indicates that the alleged infringer, who has at least as much knowledge as the trier of fact regarding the likelihood of confusion, believes that his copying may divert some business from the senior user." *Daddy's Junky Music Stores*, 109 F.3d at 286 (citation omitted).  GM argues that Defendants intended to copy its protected trademarks.  To support this, it offers evidence that, after litigation

---

[14]   It is important to note the logic behind this approach.  The standard that governs is the *likelihood* of confusion.  This requires a court to look at the typical buyers and users of the goods or services at issue because it is only the *likely* buyers who will ever have an opportunity to be confused.  If a small unsophisticated segment of the buying class will be confused, it does not follow that there is, overall, a *likelihood* of confusion.

The Court does not disagree with the Third Circuit that potential confusion to "the ultimate consumer, the car owner" must also be addressed.  *Summit*, 930 F.2d at 297.  Based on the law in this Circuit and the facts of this case, however, it is appropriate to separately analyze this group.

14

between the parties began, Tong Yang changed the format of its placeholder to a shape to which GM did not object.

This is evidence of a subsequent remedial measure which is generally prohibited by the Federal Rules of Evidence. Specifically, Rule 407 provides that "[w]hen, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . culpable conduct . . . ." FED. R. EVID. 407.

GM claims that Defendants cannot object under this rule because they "contest the feasibility of removing the trademarks from the logo area of the grille . . . ." (Pl.'s Reply Br. in Supp. of its Likelihood of Confusion Mot. at 5.) Rule 407 does permit the evidence to come in for impeachment. FED. R. EVID. 407. In this case, however, Defendants argue that the placeholder has a utilitarian purpose. They do not claim, as GM contends, that a replacement grille cannot exist without the placeholder at issue–i.e., that it is not feasible to have a generic placeholder. Indeed, even before the litigation began, Defendants sold these types of grilles. Thus, as the evidence is not used to impeach Defendants' claim, it is barred by the Rule 407.

### 8. Likelihood of Expansion of the Product Lines Using the Marks

This factor involves the likelihood of expansion in geography (i.e., selling the goods at issue in more places) as well as the types of products (i.e., using the disputed trademark on new products that are in the same channels of trade). See Homeowners Group, 931 F.2d at 1112. The parties do not dispute this factor because there is no evidence that Defendants plan to expand their sales territory and, like GM, they already sell replacement grilles.

15

*9. Conclusion*

Unfortunately, the eight-factor analysis does not lead to an obvious conclusion. As noted above, it is clear the general public associates the "bow-tie" and "GMC" marks with GM. These symbols are therefore protected by the Lanham Act. This does not imply, however, that the average buyer will assume that every part with a "bow tie" or "GMC" embedded into it was *made by* GM. In some instances, he may only conclude that the part was *made for* a GM vehicle. This case presents a unique factual situation. Other courts have, however, addressed similar problems. The Court first turns here for reference.

One such line of cases are those which dealt with repackaged and refurbished goods. *See generally* MᴄCᴀʀᴛʜʏ ᴏɴ Tʀᴀᴅᴇᴍᴀʀᴋs §§ 25:35, 25:51. The rule governing this field originated in *Prestonettes, Inc., v. Coty*, 264 U.S. 359 (1924). There, the defendant modified and repackaged the plaintiff's products. *Id.* at 367. Clearly, according to the Court, "[a] plaintiff could not prevent or complain of [a defendant] stating the nature of the component parts and the source from which they were derived if it did not use the trade-mark in doing so." *Id.* at 368. The Court, continuing with this reasoning, held that it is also permissible to use a trademark to describe those parts, so long as the public is adequately informed that defendant altered the product. *Id.* at 368-69.[15] This rule was extended to refurbished goods in *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 129

---

[15]The Court offered the following example:

> If a man bought a barrel of a certain flour, or a demijohn of Old Crow whisky, he certainly could sell the flour in smaller packages or in former days could have sold the whisky in bottles, and tell what it was, if he stated that he did the dividing up or the bottling.

*Coty*, 264 U.S. at 369.

16

(1947).[16]  These cases turn on transparency: if a reasonable user would understand that the defendant did something to plaintiff's product, use of the trademark is permissible.

The case here presents the reverse situation: Defendants sell component parts for GM's end product.  The rule can, however, be logically transferred to this case.  A defendant can use a plaintiff's trademark to show that it is a component part so long as they otherwise make it clear to the likely buyers that the part was not made by the plaintiff.

It is also useful to consider cases where a defendant's advertisements mention the plaintiff's trademark.  *See generally* McCarthy on Trademarks §§ 25:50, 25:51.  As a general rule, a competitor can state that its goods "fits with" the trademarked product.  *See*, *e.g.*, *Porter v. Farmers Supply Service, Inc.*, 617 F.Supp. 1175, 1187 (D. Del. 1985) *aff'd* 790 F.2d 882 (Fed. Cir. 1986)("Merely specifying that a replacement part will be suitable for use in a product bearing a trademarked name lacks the requisite element of actual or foreseeable deception to the public.")(citing *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 911 (Fed. Cir. 1984)).  Similarly, one that sells used goods or provides services for those goods can use the protected trade name so long as there is not confusion as to sponsorship.  *See*, *e.g.*, *Trail Chevrolet, Inc. v. General Motors Corp.*, 381 F.2d 353, 354 (5th Cir. 1967)(per curiam)("The appellants should be free to advertise that they sell used Chevrolets, that they repair Chevrolet cars, that they have a number of Chevrolets to choose from, or that they sell used Chevrolets and other fine cars or the like.

---

[16]In fashioning the appropriate relief, the *Champion* Court noted that the plaintiff had provided evidence that defendant's used product did not measure up to the same specifications as the new ones.  "But the same would be true of a second-hand Ford or Chevrolet car.  And we would not suppose that one could be enjoined from selling a car whose valves had been reground and whose piston rings had been replaced unless he removed the name Ford or Chevrolet."  *Champion*, 331 U.S. at 128-29.

They are entitled to offer Chevrolet cars for sale by the name so long as the registered mark or tradename of Chevrolet is not used in a manner to deceive purchasers."). These uses are necessary for our free market. In other words,

> [i]f the Lanham Act prohibited competitors from mentioning a product for which replacement parts were suited, parties marketing patented combinations could effectively achieve through trademark protection what is not permitted under the patent laws, namely, barring the sale of replacement parts for their products by competitors.

*Porter*, 617 F.Supp. at 1188.[17]   With this in mind, courts look at the totality of the circumstances to determine whether a purchaser would likely be confused.

The Court first notes that, in this case, GM has not shown that the relevant audience views the "bow tie" and "GMC" indentations on its grille as an indicator of origin. Instead, it relies on the general strength of its marks. This is insufficient. Defendants have

---

[17]This policy has been echoed by numerous Courts of Appeals. For instance, the First Circuit has held that

> [i]n the absence of false representations or palming off, the sale of unpatented replacement parts by one other than the manufacturer of the original equipment is neither unlawful nor actionable. Even if the parts are substandard, the rule holds–so long as their origin is not obscured. Notwithstanding some slight danger of confusion, it would . . . be difficult to take seriously an assertion that every such sale comprises unfair competition. Producing an unpatented machine does not give the producer a legal monopoly on its component parts. If a potentially lucrative aftermarket develops, imitators will flock to obtain and offer make-do surrogates, often claiming equivalent performance and some added premium (e.g., faster delivery, cheaper pricing). In the entrepreneurial world as elsewhere, copycats have always been commonplace.

*Hypertherm, Inc. v. Precision Products, Inc.*, 832 F.2d 697, 700 (1st Cir. 1987)(quotation and citations omitted); *see also Ty Inc. v. Perryman*, 306 F.3d 509, 513 (7th Cir. 2002)("We do not think that by virtue of trademark law producers own their aftermarkets and can impede sellers in the aftermarket from marketing the trademarked product.").

presented evidence that collision shop owners do not associate the placeholder with the part's origin.[18]  GM has not offered evidence to the contrary.

Moreover, even if the placeholder is treated as a trademark, the circumstances show that a buyer at the point of sale would not be confused.  Tong Yang grilles have their "OTN" trademark and "Made in Taiwan" molded into the grille.  (Yang Decl. ¶ 8.)  They are delivered in packaging which indicates that it is a Tong Yang grille and with an invoice that states "These replacement parts are not manufactured by the original manufacturer.  These parts are replacement parts for the [original] parts . . . ."  (Id. ¶¶ 8, 10.)  GM's product packaging likewise indicates that it contains an OE part made by GM.  (Clark Dep. at 42-43.)  In addition, unlike the Tong Yang grilles, the GM grilles come with the colored "bow-tie" and "GMC" medallion attached to the grille.  (Morie Dep. at 36.)  Moreover, as noted above, GM is the exclusive source for obtaining its parts, while Tong Yang's parts are sold by Keystone and other independent distributors.  Under these circumstances, there is not a likelihood of confusion as to the origin of the part.

### B.  Downstream Confusion

"Since Congress intended to protect the reputation of the manufacturer as well as to protect purchasers, the [Lanham] Act's protection is not limited to confusion at the point of

---

[18]Specifically, Defendants present the declaration of Michael Cornell, the body shop manager of John Rogin Buick Collision Shop.  He states that "the shape of the placeholder does not indicate to me where the grille came from . . . ."  (Cornell Decl. ¶ 3.)  GM first argues that this statement is not based on personal knowledge.  However, Cornell has purchased and viewed GM's grilles.  It is his opinion that the placeholders do not represent origin.  As Cornell is a member of the relevant audience, his opinion is relevant.  GM also contends that the declaration is controverted by Cornell's deposition testimony.  This is incorrect. His deposition does not suggest that he has an opinion different from his declaration.

sale." *Ferrari S.P.A. Esercizio v. Roberts*, 944 F.2d 1235, 1245 (6th Cir. 1991).[19]  A manufacturer's reputation is blemished when counterfeit products are injected into commerce even though the original purchaser may be aware he is buying a fake.  The original product may become less desirable.  For instance,

> [i]ndividuals examining [counterfeit Rolex watches], believing them to be genuine . . . , might find themselves unimpressed with the quality of the item and consequently be inhibited from purchasing the real time piece.  Others who see the watches bearing the Rolex trademarks on so many wrists might find themselves discouraged from acquiring a genuine because the items have become too common place and no longer possess the prestige once associated with them.

*Rolex Watch, U.S.A., Inc. v. Canner* 645 F.Supp. 484, (S.D. Fla. 1986)(quoted with approval in *Ferrari*, 944 F.2d at 1244-45).

In this case, there are two potential avenues for downstream confusion: a subsequent purchaser and the viewing public.  As to the latter, it is necessary to recall that GM has not brought a trade dress claim.  In addition, once any replacement grille is installed (including those without the allegedly infringing placeholder), a colored medallion in the shape of the "bow tie" or "GMC" mark is affixed to the grille.  Thus, once the grille is installed on the vehicle, the public is viewing it in an altered form.  Specifically, they cannot see the placeholder.  Thus, it is not possible to have an improper affiliation based on the feature GM complains about.[20]

---

[19]The Sixth Circuit has noted, however, that "the eight factor test used to determine likelihood of confusion focuses on the confusion of the purchaser, not the public." *Ferrari*, 944 F.2d at 1245.  It follows that this test is not as helpful for determining downstream confusion as it is for point of sale confusion.

[20]In its brief, GM states that, with some "plain vanilla" placeholders, the public can see the overlap because the placeholder is larger than the medallion.  Based on this, it argues that the public can discern an OE part from a non-OE part once the grille is installed and

The parties do not provide much evidence of the first potential type of downstream confusion. It is not necessary, however, as the analysis is similar to that undertaken above. The only noteworthy difference is that this category of purchasers may not have as much expertise. This does not, however, alter the end conclusion. As with point of sale purchasers, there is no likelihood of confusion when the Tong Yang grilles come clearly marked and packaged.

## C. Contributory Infringement

Contributory infringement also does not occur at the initial point of sale. Contrary to general downstream confusion, however, it requires culpable conduct by a third-party and a degree of awareness by the provider. Specifically,

> if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit.

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 854 (1982)(citations omitted).[21]

As discussed above, GM claims that part swapping, cost shifting, and mis-packaged returns are evidence of actual confusion. They are not. Instead, these alleged practices are possible means to hold Defendants liable under the contributory infringement doctrine.

_____

the medallion is affixed. This argument is not logical. A non-OE part may have a placeholder that is smaller than the medallion just as it may have one that is larger. Moreover, there is no evidence that the public would ever make this difficult jump–i.e., because there is no overlap, the part is made by GM. It must therefore be rejected.

[21]The Supreme Court specifically noted that a "could reasonably anticipate" standard is not proper because it is a "watered down" version of the proper test. *Inwood*, 456 U.S. at 854 n.13.

21

The allegations here are not far off those addressed in *Inwood*. The plaintiff there, the pharmaceutical manufacturer of CYCLOSPASMOL, brought an action against its competitors who sold generic versions of CYCLOSPASMOL. *Id.* at 846-47. The pills were the same size, shape, and color; but, plaintiff's name was imprinted on the CYCLOSPASMOL capsules and the defendants' pills were blank. *Id.* The defendants also advertised their products in a catalog describing the generic products as "equivalent" or "comparable to" CYCLOSPASMOL and listing the differences in price. *Id.* at 847-48. The plaintiff complained that "the generic manufacturers' use of look-alike capsules and [the catalog descriptions] induced pharmacists to illegally substitute a generic drug for CYCLOSPASMOL and to mislabel the substitute drug CYCLOSPASMOL." *Id.* at 850. The district court found that the defendants neither intend the mislabeling nor should have known that it would result. *Id.* at 852.[22]

It must be noted that, for a finding of contributory infringement, it is first necessary to show that there is direct infringement. *See*, *e.g.*, *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). In this case, Plaintiff has not shown that direct infringement ever occurred. Although it gives evidence of one instance of an attempted mis-packaged return, it was not with a Tong Yang grille.

GM has also not provided evidence that Defendants either intended the alleged direct infringement or should have known about it. Tong Yang grille do resemble OE Parts. To the extent that GM claims that, because of this, Defendants should have known about

---

[22]The Second Circuit reversed and found a violation. *Inwood*, 456 U.S. at 852-53. The Supreme Court then reversed and remanded because the Second Circuit did not apply a clearly erroneous standard. *Id.* at 858-59.

possible infringement, the Court disagrees.  If it were held otherwise, every replacement part manufacturer could be held liable on a contributory infringement theory merely because its parts looked like the original.  This would give a trademark holder unintended rights.  GM's claim for contributory infringement must therefore fail and Defendants motion for summary judgment on the issue of likelihood of confusion is granted.

## IV.  Conclusion

For the reasons stated above, the Court finds that there is not a likelihood of confusion between Plaintiff's and Defendants' products.  Therefore, the Court hereby orders that Defendants' motion for summary judgment is GRANTED and Plaintiff's motion for summary judgment is DENIED.  The Court also DENIES Defendant's motion to strike portions of Plaintiff's brief.

SO ORDERED.


s/Nancy G. Edmunds_____
Nancy G. Edmunds
United States District Judge

Dated:  May 10, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 10, 2005, by electronic and/or ordinary mail.

s/Carol A. Hemeyer_____
Case Manager